JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Keith Fluellen appeals his conviction and sentence for aggravated burglary and aggravated murder. Defendant was a long-time friend of the victim, Robert McCall, although they had had a falling out in 1998, at which time McCall changed the locks on his house and the combination to his house alarm after defendant moved out.
{¶ 2} Nonetheless, the two remained friends and socialized, with defendant often being a guest at McCall's home. McCall's cousin, Andre Burns, sometimes socialized with the two of them.
{¶ 3} On November 9, 1999, McCall called his cousin, Burns, and a friend and coworker, Greg Kinney, around 10:30 in the evening, asking them to come and help him because he had been in a fight with defendant and was cut. When they arrived separately at McCall's home, they discovered trails of blood between the kitchen and living room from McCall's bleeding hand. They also found that the furniture in the dining room had been damaged and the glass from a curio cabinet had been broken.
{¶ 4} Before McCall left for the hospital with his coworker, Kinney, the phone rang twice. McCall's cousin answered it and informed both callers that McCall was not home. He identified the first caller as a man named Brian and the second as defendant. A phone trace later showed that both calls originated from the home of defendant's girlfriend, where defendant lived.
{¶ 5} Shortly after the phone calls, the victim, McCall, and his friend Kinney left for the hospital while the cousin locked up McCall's house and set the alarm. When Kinney and McCall were driving back from the hospital, McCall asked Kinney to drive past defendant's address. He pointed out the house where defendant lived with his girlfriend. Kinney testified that although he couldn't say that McCall feared for his life, McCall definitely feared for his safety. Kinney did not feel that his friend was in enough danger, however, to prevent him from being left alone.
{¶ 6} After he got home, McCall paged his cousin to let him know that he had returned home from the hospital safely. His cousin testified that McCall did not seem concerned about anything during their conversation.
{¶ 7} The following morning at 7:36 AM, 911 received a call from McCall's address reporting that a man had been shot in the head. When the police arrived, EMS was present waiting for the police to assist in breaking into the house. McCall was found dead on the kitchen floor with a gunshot wound to the head. No suspect was found on the premises. Because the victim was already dead, he was left on the floor while homicide detectives and the Scientific Investigative Unit (SUI) examined the scene, taking trace evidence samples. The scientist who testified at trial concerning this evidence was not the same person who obtained or initially examined it.
{¶ 8} The police interviewed Kinney and the cousin, both of whom told them about the fight between McCall and defendant the night before. The police also played the 911 tape for the cousin, who identified the caller as defendant. Because of the poor quality of the tape, further scientific examinations failed to confirm that the voice on the tape was defendant's.
{¶ 9} Defendant and his mother went to the police station where he turned himself in. He was read his Miranda rights, and then stated that he had not been at the victim's house on either of the days in question. He then told the police, "I'm not saying anything more." Tr. at 394.
{¶ 10} At trial, the state presented Kinney, the cousin, the victim's mother, the first officer on the scene, the detective on the scene, a fingerprint expert, the coroner who conducted the autopsy, and a representative from the coroner's lab. The representative from the lab had neither collected the evidence nor conducted the initial procedures on the evidence. Nor had she been to the crime scene. She was, however, the person who signed the lab report and attested to its contents.
{¶ 11} The jury found defendant guilty of aggravated burglary and aggravated murder. He was sentenced to consecutive sentences; the state concedes that the case must be remanded on sentencing errors. Appellant timely appeals.
{¶ 12} For his first assignment of error, appellant states,
 {¶ 13} I. THE TRIAL COURT COMMITTED PLAIN ERROR IN VIOLATION OF EVID.R. 602, 703, 801, 802 AND THE RIGHT TO CONFRONTATION AND DUE PROCESS GUARANTEED BY THE CONSTITUTIONS OF THE UNITED STATES AND OHIO WHEN IT ADMITTED: (1) TESTIMONY OF AN EXPERT (a) TO AN OPINION NOT BASED UPON FACTS OR DATA EITHER PERCEIVED BY THAT EXPERT OR ADMITTED INTO EVIDENCE, AND (b) TO INADMISSIBLE HEARSAY OF OTHERS, CONCERNING TESTS, THAT THE EXPERT DID NOT CONDUCT OR OBSERVE, AND THE RESULTS OF THOSE TESTS, AND (2) THE REPORT OF THE TEST RESULTS, WHICH IS INADMISSIBLE HEARSAY AND FOR WHICH THERE IS NO FOUNDATION.
{¶ 14} Appellant's first assignment of error addresses the testimony of one of the state's expert witnesses, Julie Heinig, a forensic DNA scientist with the coroner's office. Ms. Heinig is well-qualified to serve as an expert in the area of forensic DNA analysis, and defendant stipulated to her admission as an expert in DNA analysis. Tr. at 314. Defendant claims that, because Ms. Heinig did not actually perform the tests on the blood herself, her testimony that the blood found at marker 4 was about matters of which she had no personal knowledge and, therefore, inadmissible hearsay.
{¶ 15} Heinig testified, however, that she reviewed the evidence that was collected, as well as the report that was prepared. (Ex. 9.) Furthermore, under her title as "Forensic Scientist, DNA," Heinig personally signed the report documenting the examination of the blood. Although two other persons signed above and below her name, hers is the name on the signature line. The defendant never provided any evidence to challenge her responsibility for the report, not did defendant question either the protocols the lab followed or her supervision over those who performed the lab tests. Her testimony sufficiently established that she was familiar with the operation of the DNA lab, as well as with this particular report, and thus that she was qualified to authenticate the report.
{¶ 16} There is a special statutory provision covering reports from an office such as the Cuyahoga County Coroner's office, where Mrs. Heinig works as a forensic scientist. R.C. 313.10 states in pertinent part:
 {¶ 17} The records of the coroner, made personally by the coroner or by anyone acting under the coroner's direction or supervision, are public records, and those records, or transcripts or photostatic copies of them, certified by the coroner, shall be received as evidence in any criminal or civil court in this state, as to the facts contained in those records.
{¶ 18} See, also, State v. Mock, supra. The prosecutor could have used this statute for a simple way to admit the report. However, because the coroner did not certify the report, it does not qualify under this statute.[1]
{¶ 19} Lab reports are admissible under another exception, R.C.2317.36,[2] which provides for composite reports:
 {¶ 20} A written report or finding of facts prepared by an expert who is not a party to the cause, nor an employee of a party, except for the purpose of making such report * * *, and containing conclusions resulting wholly or partly from written information furnished by a co-operation of several persons acting for the common purpose, shall, in so far as the same is relevant, be admissible when testified to by the person, or one of the persons, making such report or finding without calling as witnesses the persons furnishing the information, * * * if, in the opinion of the court, no substantial injustice will be done the opposite party. (Emphasis added.)
{¶ 21} R.C. 2317.38 specifies the conditions for admitting such a report:
 {¶ 22} The report or finding mentioned in section 2317.36 of the Revised Code is not admissible unless the party offering it has given notice to the adverse party a reasonable time before trial of his intention to offer it, together with a copy of the report or finding, or so much thereof as relates to the controversy, and has afforded him a reasonable opportunity to inspect and copy any records or other documents in the offering party's possession or control, on which the report or finding was based, and also the names of all persons furnishing facts upon which the report or finding was based.
{¶ 23} In the case at bar the conditions specified in R.C. 2317.36
and 2371.38 were satisfied. Ms. Heinig testified that she supervised the tests, reviewed the samples collected, and signed the report as the party responsible for its contents. She was, therefore, one of the persons making the report. The record shows, furthermore, that the defense requested the court for an order to disclose evidence the state intended to use at trial. This request was repeated in a "Request for Discovery," in response to which the prosecutor indicated, under the category of evidence, the following: "Blood samples" and "Trace evidence reports." Julie Heinig testified that "trace evidence" includes "hairs, fibers and also blood" and that these fall under the umbrella term of trace evidence. Tr. 31. The prosecutor's response, which was filed January 4, 2000, gave the defense, therefore, the statutory notice.
{¶ 24} On May 16, 2000, in another Response to Request for Discovery, the prosecutor specified that the trace evidence report was enclosed. The trial began on July 25, 2000. Thus the statutory requirement of providing a copy was satisfied. Julie Heinig identified Exhibit 9 as a copy of the "trace evidence report" and explained it was "a report generated in our lab which states all of the evidence submitted and the tests that we did in this case." Tr. 316. Exhibit 9 includes the DNA blood lab report, which contained the names and signatures of two members of the lab who cooperated with Julie Heinig in the production of this report.
{¶ 25} From the facts recounted above, we conclude that the statutory requirements of R.C. 2317.38 for admitting the report were satisfied. First, the Prosecutor announced the intent to offer the report as evidence. Second, because of the lapse of almost two months between receiving the report and the trial, the defense had sufficient time to interview any lab members whose work furnished facts upon which the report may have been based.[3] Finally, the report identified two members of the staff that worked on the report. The challenged DNA blood lab report, therefore, fits the type described in R.C. 2317.36 and satisfies the conditions under R.C. 2317.38 for admitting such a report into evidence.
{¶ 26} We further observe that since there was no objection to the report or the testimony of Heinig, this court reviews this assignment of error under the plain error standard, which requires that the outcome of the trial would be different but for this record and testimony. Defendant fails to meet that criterion. Because of testimony identifying defendant's voice on the 911 tape, his fresh fingerprint on the windowsill, and his earlier fight with the victim, about which he lied to the police when he said he was not at the victim's house the night before, we cannot say that the outcome of the trial would have been different but for the testimony of Heinig.
{¶ 27} Therefore, Ms. Heinig's testimony was properly admitted, and this assignment of error is, accordingly, overruled.
{¶ 28} For his second assignment of error, appellant states,
 {¶ 29} II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY (1) THE ADMISSION OF OTHER ACTS TESTIMONY IN VIOLATION OF R.C. 2945.59, EVID.R. 404(B) AND APPELLANT'S RIGHTS UNDER ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION THAT APPELLANT CUT MR. MCCALL AND (2) APPELLANT WAS DENIED A FAIR TRIAL WHEN (1) THE PROSECUTOR (a) ARGUED THAT THE FACT THAT APPELLANT CUT MR. MCCALL MEANS THAT HE KILLED HIM AND (b) THE PROSECUTOR REPEATEDLY MISREPRESENTED THE EVIDENCE.
{¶ 30} Appellant complains that admitting evidence that defendant had a fight with McCall several hours before he was murdered was prejudicial to defendant because the jury would be more likely to believe that he had come back to "finish the fight." Defendant, not denying the fight itself, claims that McCall's murder was an unrelated incident.
{¶ 31} The state, on the other hand, argues that this evidence is admissible, however, under Evid.R. 404(B), which states as follows:
 {¶ 32} Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Emphasis added.)
{¶ 33} The state also cites R.C. 2945.59, which states as follows:
 {¶ 34} In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant. (Emphasis added.)
{¶ 35} At issue is whether the fight of the previous evening would be considered a motive for defendant to break into McCall's house with a gun. Defendant relies heavily on the fact that McCall told the emergency room doctor that the fight was over and that there would be no more violence. However, as the state points out, McCall expressed fear to Kinney when he pointed out defendant's house to Kinney on the way home from the hospital. It was proper, therefore, for the fact finder to be permitted to know this fact and make a judgment as to whether it provided a motive. Hence, the trial court did not err in admitting evidence of the fight the evening before the murder.
{¶ 36} Defendant also complains that the prosecutor stated in closing argument that the negative results of the metal and residue tests on the victim showed that he had not handled a gun on the night of the murder. Further, defendant complains that the prosecutor mentioned that the cousin said that the voice in the phone call to victim's house the previous evening and on the 911 tape sounded like defendant and that defendant's "fresh" fingerprint was found on a window sill of victim's house. Finally, he argues that the prosecutor's allegation that a stereo may have been taken from the victim's home was conjecture. Defendant argues that these cumulative comments amount to prosecutorial misconduct depriving him of a fair trial.
{¶ 37} "The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. * * * In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial." State v. Conklin (Dec. 17, 1998), Tuscarawas App. No. 1997AP110077, at *6. See, also, State v. Lane (1995), 108 Ohio App.3d 477. Additionally, "[s]ome latitude and freedom of expression are permitted for closing argument." State v. Aponovitch (1987), 33 Ohio St.3d 19, 24.
{¶ 38} The prosecutor did misstate in closing argument that the absence of residue on the victim's hands indicated that it was highly unlikely he had handled a gun. Tr. at 449-45.[4] It was also unsupported speculation that a stereo was missing from the house, because there was no evidence that a stereo had ever been there.
{¶ 39} We agree some statements in the prosecutor's closing argument were unfounded. These comments, even if taken together, however, do not rise to the level of denying the defendant a fair trial. For example, whether or not the victim handled a gun was not material to whether or not the defendant shot him. The other prosecutorial statements have a basis in testimony. The identification of the voice on the telephone and tape was based upon the cousin's testimony. The cousin testified that the voice on the phone and the 911 tape was defendant's, but the jury knew that the expert witness was not able to make a positive identification of the voice on the 911 tape through scientific tests. The jury was able to weigh the evidence as it was presented. The fingerprint, which the prosecutor argued was "fresh," had been identified as "recent" by the police lab. It could as easily have been left at the time of the fight the evening before as at the time of the murder. The jury was aware of this possible interpretation of the evidence. Finally, the issue of the stereo does not make it more or less likely that defendant committed the murder, because the defendant was never connected to any stereo.
{¶ 40} Accordingly, the second assignment of error is overruled.
{¶ 41} For his third assignment of error, appellant states,
 {¶ 42} III. THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS OF LAW AND TO A FAIR TRIAL AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION WHEN IT PERMITTED PREJUDICIAL AND IRRELEVANT EVIDENCE THAT MR. MCCALL FEARED FOR HIS SAFETY AND THE COURT DENIED A SUBSEQUENT MOTION FOR MISTRIAL.
{¶ 43} Defendant argues that it was error for the court to allow hearsay evidence of what the victim was feeling the night before he was killed.
{¶ 44} Evid.R. 803(3) provides the following exception to the hearsay rule:
 {¶ 45} Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
Defendant argues that this exception should apply only to the defendant's state of mind, and not to the murder victim's.
{¶ 46} We disagree. An extensive body of case law contradicts the defendant's position. The Supreme Court of Ohio rejected this argument inState v. Awkal (1996), 76 Ohio St.3d 324, 330-331; State v. Frazier
(1995), 73 Ohio St.3d 323, 337-338; State v. Simko (1994),71 Ohio St.3d 483, 490-491; State v. Reynolds (1988), 80 Ohio St.3d 670,677-678; and State v. Apanovitch (1987), 33 Ohio St.3d 19.
{¶ 47} Although questioning the reasoning of Apanovitch and requesting the Supreme Court of Ohio to reassess its position on the issue, this court in State v. Hawn (2000), 138 Ohio App.3d 449 held that testimony describing the state of mind of a murder victim was admissible because the law of Apanovitch was controlling. Recently, this court reaffirmed the admissibility of state of mind evidence of a murder victim. In State v. Fortson (August 2, 2001), Cuyahoga App. No. 78240, at *13, we held that "[t]he victim's statements concerning her fear of impending harm from defendant fall within this exception. The specific statement `"[defendant] told me if I go back he will kill me'" is equivalent to the statement `"He is going to kill me'" found to be permissible in State v. Frazier, supra." See, also, State v. Wages
(1993), 87 Ohio App.3d 780.
{¶ 48} Consistent with the ruling of the Supreme Court of Ohio, as well as this court, on this issue, we find that the trial court did not err in admitting state of mind testimony of the victim.
{¶ 49} The third assignment of error is overruled.
{¶ 50} For his fourth assignment of error, appellant states,
 {¶ 51} IV. THE TRIAL COURT DENIED APPELLANT'S DUE PROCESS RIGHTS WHEN IT PERMITTED THE PROSECUTION TO VIOLATE APPELLANT'S PRIVILEGE AGAINST SELF-INCRIMINATION BY ELICITING TESTIMONY ABOUT DEFENDANT'S POST-ARREST, POST-MIRANDA RIGHTS SILENCE, WHICH IS ALSO IRRELEVANT AND INADMISSIBLE.
{¶ 52} The detective testified that after defendant had been placed under arrest and read his Miranda rights, he denied being at McCall's home on either November 9th or 10th. The 9th was the day of the fight in which McCall was injured; the 10th was the day he was murdered. When the detective asked defendant where he was on those days, he replied, "I'm not saying anything more." Tr. at 394. Defendant did not object to this testimony. We note that because defendant failed to object to the testimony, our analysis must be based upon the plain error standard. State v. Combs (1991), 62 Ohio St.3d 278, 281.
{¶ 53} On appeal, defendant argues that this testimony violated his right to remain silent because it placed before the jury his refusal to continue any interrogation. The state counters that once he began speaking, he had waived his right to suppress anything he actually said. Although the state cannot comment on his subsequent silence, the state argues it is free to quote anything he did say and to use it against him. We agree.
{¶ 54} In a case with analogous facts, the Supreme Court of Ohio explained, "[b]ecause [defendant] did not remain silent, but freely gave his alibi, it was proper to inform the jury that he refused to give details to corroborate that alibi." State v. Gillard (1988),40 Ohio St.3d 226, 231. Thus once defendant started talking, the state was allowed to elicit evidence of the statements he made before he stopped talking. "If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only part of his story is certainly not protected" by his Miranda rights. State v.Osborne (1977), 50 Ohio St.2d 211, 216.
{¶ 55} In the case at bar, The trial court did not err by permitting the detective's challenged testimony. The fourth assignment of error is overruled.
{¶ 56} For his fifth assignment of error, appellant states,
 {¶ 57} V. APPELLANT'S RIGHTS UNDER ART. I SECT. 16 OF THE OHIO CONSTITUTION AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WERE VIOLATED, AND HE WAS IMPROPERLY DENIED A CRIM.R. 29 ACQUITTAL OF AGGRAVATED MURDER AND AGGRAVATED BURGLARY.
{¶ 58} Defendant claims that the state failed to prove either that he shot the victim or that he entered the victim's house with the intent to shoot him. Therefore, he states, the trial court should have granted his motion for acquittal under Crim.R. 29.
{¶ 59} Crim.R. 29(A) states,
 {¶ 60} The court on motion of a defendant or on its own motion, after the evidence of either side is closed, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.
{¶ 61} In reviewing a motion for acquittal the role of the court of appeals is not to weigh the evidence, but to determine whether, as a matter of law, "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." State v. Martin
(1983), 20 Ohio App.3d 172, paragraph two of the syllabus.
{¶ 62} Defendant argues that the state failed to present any admissible evidence to show that defendant committed the burglary or murder with which he is charged. Specifically, he argues that because the DNA evidence identifying the blood in McCall's driveway is inadmissible, as is the evidence regarding the victim's state of mind and the fight between the victim and defendant of the previous night, the state failed to present evidence to show that defendant was the murderer. As noted in the discussion under the first and third assignments of error, however, we have decided the trial court correctly admitted the evidence which defendant claims was inadmissible.
{¶ 63} Additionally, defendant points out the state presented no evidence to show that, even if defendant did break into the house and then later kill McCall, he had the intent to kill McCall at the time he broke in. In order for the crime to qualify as burglary, the defendant would have had to plan to murder the victim prior to breaking in. The defendant claims the state presented no evidence to show that this was defendant's intent.
{¶ 64} On the contrary, there is evidence that defendant broke into the victim's house during the night with a gun in his possession, and that the defendant had a knife-fight with the victim the previous evening. This evidence suffices to show intent to injure or murder. Defendant's familiarity with the victim's house provides opportunity, while defendant's possessing a gun at the time of the break-in shows preparation and planning. When defendant, who had previously been a welcomed guest in victim's home, broke in with a gun in the middle of the night, the jury could certainly infer his intent to injure or kill the victim, who had expressed his fear of defendant. The prosecutor, therefore, presented sufficient evidence of intent.
{¶ 65} There was evidence of forced entry into victim's home, defendant's recent fingerprint on the outside window sill, defendant's fresh blood in the driveway, and defendant's 911 call, even if challenged, that the victim had been shot. Even though defendant claimed he was not at the victim's home on the day of the fight or the day of the murder, sufficient evidence exists for a rational trier of fact to determine beyond a reasonable doubt that defendant had murdered the victim. The trial court did not err in denying defendant's motion for acquittal.
{¶ 66} The fifth assignment of error is overruled.
{¶ 67} For his sixth assignment of error, appellant states,
 {¶ 68} VI. DEFENSE COUNSEL'S FAILURE TO MOVE TO EXCLUDE FOR CAUSE A JUROR WHO STATED THAT THE DEFENSE MUST REBUT THE STATE'S EVIDENCE DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, A FAIR TRIAL, AN IMPARTIAL JURY AND DUE PROCESS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, NINTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION AND ARTICLE I, SECTIONS 1, 2, 5, 9, 10, 16
AND 20 OF THE OHIO CONSTITUTION.
{¶ 69} Defendant claims that because his trial counsel did not move to excuse for cause a juror who gave an allegedly wrong answer to a question during voir dire, he was denied effective assistance of counsel, a fair trial, and an impartial jury. The exchange complained of by defendant is brief. In response to the question, "Does the defense have to put on any defense, any evidence?" a juror answered, "Sure." Counsel then asked, "We do?" The juror replied, "Well, innocent until proven guilty, but if they are saying they are coming up with something, then you have to come up and say, `Well, why is that?'" to which defendant's attorney replied, "Good point." Tr. at 81. In this exchange, the juror essentially said that the defense did not have to present evidence unless the state presented evidence which would require rebuttal.
{¶ 70} Defendant claims that this juror misunderstood the law. Defendant cites to R.C. 2313.42(J), which states that a juror may be challenged for cause if he "will not follow the law as given to him by the court." Defendant presents no evidence, however, that this juror was unwilling to follow the law. Further, the juror's understanding was not wrong; he merely stated that if the prosecutor presented evidence which was convincing, the defendant would need to rebut or refute that evidence to protect his case. Defendant was not, therefore, denied a fair trial or an impartial jury.
{¶ 71} The sixth assignment of error is overruled.
{¶ 72} For his seventh assignment of error, appellant states,
 {¶ 73} VII. THE TRIAL COURT ERRED BY ORDERING CONSECUTIVE SENTENCES WHEN IT FAILED TO MAKE THE FINDINGS REQUIRED BY R.C. 2929.14(E)(4) AND STATE REASONS FOR THOSE FINDINGS, AS REQUIRED BY R.C. 2929.19(B)(2)(C).
{¶ 74} For the aggravated burglary, defendant was sentenced to nine years, which was to be served consecutively to the sentence of 20 years to life for aggravated murder.[5] In order to sentence a person to consecutive sentences, the court must make certain findings on the record. R.C. 2929.14(E)(4) states as follows:
 {¶ 75} If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 76} (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 77} (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 78} (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
{¶ 79} Further R.C. 2929.19(B)(2)(c) states, in pertinent part, that when the trial court imposes consecutive sentences, it must give reasons for its findings. The trial court failed either to make the required findings or to give supporting reasons. The state has conceded this assignment of error has merit and that the defendant must be remanded for resentencing. Therefore, the case must be remanded for resentencing in compliance with the statute.
{¶ 80} For his eighth assignment of error, appellant states,
 {¶ 81} VIII. APPELLANT WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY ART. I, SEC. 10 OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN DEFENSE COUNSEL FAILED TO MOVE TO EXCUSE JUROR TRACY AND FAILED TO OBJECT TO TESTIMONY TO POST-MIRANDA, POST-ARREST SILENCE, INADMISSIBLE HEARSAY, PROSECUTORIAL MISCONDUCT, AND CONSECUTIVE SENTENCES.
{¶ 82} Defendant argues that throughout the case his attorney made a series of serious errors which denied him effective assistance of counsel. A review of the record, however, shows that this is not the case.
{¶ 83} Appellant's counsel objected frequently to the "other acts" testimony, to the "state of mind of the victim" testimony, and to various other aspects of the trial. Counsel not only moved for acquittal twice, he also repeatedly moved for mistrial on the issues he believed to be improper. The trial court denied all these motions.
{¶ 84} We have already shown that the issues defendant raised to support his claim of ineffective assistance of counsel have no merit. As discussed in Assignment of Error VI, defense counsel did not err when he allowed juror Tracy to remain on the jury. Further, as discussed in Assignment of Error IV, defendant's comments to the detective and his subsequent refusal to continue talking were properly in evidence. Additionally, in our discussion of Assignments of Error I and III, we determined that the alleged inadmissible hearsay is covered by valid hearsay exceptions and, therefore, failure to object by counsel cannot be error. Finally, as discussed in Assignment of Error II, any prosecutorial misconduct was harmless error. Counsel's failure to object, therefore, cannot constitute ineffective assistance of counsel.
{¶ 85} The standard for determining ineffective assistance of counsel is set out in Strickland v. Washington (1984), 466 U.S. 668. The United States Supreme Court provided a two-part test for reviewing such claims. First, the defendant must show that his lawyer's "performance fell below an objective standard of reasonable representation and that prejudice arose from the lawyer's deficient performance." State v.Gonzalez (March 15, 2001), Cuyahoga App. No. 77338, at *15. Second, appellant also must show that but for his counsel's substandard performance the outcome of his case would have been different. However, "[j]udicial scrutiny of a lawyer's performance must be highly deferential." Id.
{¶ 86} As noted above, defendant has failed to show that his counsel's performance was substandard, or that the outcome of the trial would have been different but for his counsel's performance.
{¶ 87} The eighth assignment of error is overruled.
Affirmed in part, reversed in part and remanded for resentencing.
It is ordered that appellee and appellant share equally the costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TIMOTHY E. McMONAGLE, J., and TERRENCE O'DONNELL, J., CONCUR, (SEESEPARATE CONCURRING OPINION).
[1] In State v. Boyd (1992), Cuyahoga App. No. 60639, 1992 Ohio App. LEXIS 2744, this court admitted testimony from one coroner about an autopsy performed by another coroner. The court admitted her testimony because "the autopsy was taken under her control and direction and she personally reviewed [the other coroner's] findings with him." Id. at 19. The Boyd court held that at trial the coroner "testified as to matters within her own personal knowledge. [She] merely related to facts obtained through her personal observations and review. Moreover, she was undoubtedly qualified as an expert to testify as to the `autopsy protocol'." Id. at 20. Similarly here, Heinig directed and controlled the tests. Further, as a DNA forensic scientist, she would be qualified to testify concerning the procedures for that test. However, because she did participate in creating the trace evidence report, we assess the admission of the evidence under that fact.
[2] The prosecutor does not argue on the basis of R.C. 2317.36.
[3] We note, however, that the trial was originally scheduled for May 22. The report should have been sent in the prosecutor's first response. In fact, the defendant should not even have to ask for this report. Under R.C. 2317.38, the burden is on the prosecutor to initiate production. Had the trial proceeded as originally scheduled, providing the document on May 16 may well have prevented the use of this statute. It is unclear why the prosecutor waited five months to produce the report.
[4] Defendant is correct in stating that the negative results are not proof that the victim did not handle a gun because some people test negative even though they have handled a gun.
[5] The sentence for the three-year firearm specification was consecutive to the murder term. This portion of the sentence is not being appealed.