OPINION
{¶ 1} Defendant-appellant, Jason Bromagen, appeals his convictions in the Clermont County Court of Common Pleas for aggravated robbery and theft.
 {¶ 2} On April 6, 2004, at about 1:13 a.m., two unidentified individuals robbed a Dairy Mart on State Route 28 in Goshen Township, Ohio. According to the store clerk on duty at the time, he was reading a magazine when "before [he] knew it," two individuals came "in the door saying this is a robbery, we're not playing." Both individuals wore sweat pants, hooded sweatshirts (also called "hoodies"), with the hoods pulled down near their eyes, and blue bandannas across their face. One wore a grey hoodie while the other wore a navy blue hoodie. While one of the individuals stood in front of the counter, the other individual, armed with a knife, went behind the counter and told the clerk to open the register. The clerk complied and gave the money from the register to the individual in front of the counter. Meanwhile, the armed individual stole cartons of Marlboro Lights. Shortly after the individuals left the store with $737.80 worth of money and cigarettes, the clerk called the police. The clerk was unable to physically describe or identify the individuals.
 {¶ 3} In July 2004, appellant was arrested in connection with the Dairy Mart robbery and indicted on one count of aggravated robbery in violation of R.C. 2911.01(A)(1) and one count of theft in violation of R.C. 2913.02(A)(1). During a jury trial, appellant presented the alibi testimony of two friends who indicated that appellant was with them at their apartment during the early morning hours of April 6, 2004. Nonetheless, a jury found appellant guilty as charged. Appellant appeals, raising two assignments of error.
 {¶ 4} Assignment of Error No. 1:
 {¶ 5} "THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF THE DEFENDANT PERMITTING, OVER DEFENSE OBJECTION, TESTIMONY REGARDING OTHER ALLEGED ROBBERIES THAT WERE ALLEGEDLY COMMITTED BY THE DEFENDANT."
 {¶ 6} At trial, the trial court allowed Detective Jeffrey Lacey of the Goshen Police Department to testify, over defense counsel's objection, about other robberies (the "other robberies") allegedly committed by appellant. Det. Lacey testified that when he questioned appellant about the Dairy Mart robbery, appellant denied any involvement. Appellant, however, had information about other robberies in the area, to wit: Darrell Hughes, Jeremy Plant, and/or Terry King robbed a Shell in Miami Township where Hughes bought a Mountain Dew and left it there; a Motel 6 in Sharonville where Plant accidentally left the cash box behind; a Super America in Loveland twice; a store in Mt. Orab; a store in Brown County; another store in Brown County; a Shell on Fields Ertel Road in Warren County; and a store in Highland County. Appellant also stated that his car was used in at least two of the robberies, to wit: his car was borrowed for the Shell robbery in Miami Township and he personally drove Hughes, Plant, and King to one of the Super America robberies.[1]
 {¶ 7} According to Det. Lacey, appellant then "proceeded to describe on how they [Hughes, Plant, and King] * * * would do these robberies. He stated that they would wear the same clothing and borrow different vehicles. They would case up the * * * store first; then they would park away from any camera systems; and they would approach the building. When they get to the front glass of the business, they would stoop down so the clerk would not be able to see them approach the front doors. Then they would walk into the business and rob the store. * * * One person would hold a knife on the cashier in order to get the money. And the secondary person would go back and get the cigarettes." Appellant also stated they would always get money and cigarettes out of these robberies.
 {¶ 8} Hughes, in turn, testified that before the Dairy Mart robbery, he and appellant had robbed stores "quite a few [times]." He also testified that (1) they both always wore a hoodie, (2) one of them would always be armed with a knife, (3) they stole money and cigarettes during these robberies, (4) they never got dressed for a robbery at someone's apartment or someplace other than their car, (5) every time they robbed a store, they would put on the hoodies, sweat pants, and bandannas at the scene of the robbery, and (6) Plant was not involved in any of the robberies.
 {¶ 9} Appellant argues that the trial court erred when it admitted Det. Lacey's foregoing testimony in violation of Evid.R. 404(B). Specifically, appellant argues that there was no substantial evidence that appellant committed the other robberies; there was no modus operandi relating any of the other robberies to the Dairy Mart robbery appellant was charged with; and the wrongful admission of such testimony was highly prejudicial.
 {¶ 10} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Robb,88 Ohio St.3d 59, 68, 2000-Ohio-275. Absent an abuse of discretion as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of evidence.State v. Martin (1985), 19 Ohio St.3d 122, 129. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Wolons (1989), 44 Ohio St.3d 64, 68. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. State v. Yeager, Summit App. No. 21510, 2005-Ohio-4932, ¶ 29.
 {¶ 11} Evid.R. 404(B) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evidence of other acts is admissible if (1) there is substantial proof that the alleged other acts were committed by the defendant, and (2) the evidence tends to prove, inter alia, identity. State v. Lowe,69 Ohio St.3d 527, 530, 1994-Ohio-345.
 {¶ 12} "Identity is in issue when the fact of the crime is open and evident but the perpetrator is unknown and the accused denies that he committed the crime." State v. Smith (1992),84 Ohio App.3d 647, 666. In the case at bar, the identification of appellant as one of the perpetrators of the Dairy Mart robbery was at issue as appellant denied taking part in the crime.
 {¶ 13} Other acts can be evidence of identity by establishing a modus operandi applicable to the crime with which a defendant is charged, that is, by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense. Lowe,69 Ohio St.3d at 531. While the other acts need not be the same as or similar to the crime charged, they should show a modus operandi identifiable with the defendant. Id. "A certain modus operandi is admissible not because it labels a defendant as a criminal, but because it provides a behavioral fingerprint which, when compared to the behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator." Id. "To be admissible to prove identity through a certain modus operandi, other-acts evidence must be related to and share common features with the crime in question." Id.
 {¶ 14} We first find that substantial proof existed that appellant committed the other robberies testified to by Det. Lacey. Other-acts evidence need be proved only by substantial proof, not proof beyond a reasonable doubt. Other-acts evidence is not admissible, however, if it is of a vague or remote character. State v. Carter (1971), 26 Ohio St.2d 79, 82, citingScott v. State (1923), 107 Ohio St. 475. Although Hughes did not specifically testify as to the other robberies testified to by Det. Lacey, Hughes did testify that he and appellant had "robbed stores "quite a few times before the Dairy Mart robbery. His description of the manner he and appellant would commit robberies was very similar to the description appellant gave to the detective. According to the detective, appellant, in turn, admitted his involvement in at least two of the other robberies (if not three) via the use of his car. This was a clear admission against interest. See State v. Smith, Cuyahoga App. No. 79527, 2002-Ohio-2145 (defendant's written statement to police regarding intended theft did not amount to inadmissible other acts evidence, where statement was made against interest and tended to prove common motivation between intended theft and theft which really occurred). Det. Lacey's testimony regarding the other robberies therefore satisfies the first prong under Lowe.
 {¶ 15} Next, we find that the other robberies testified to by Det. Lacey were admissible to prove appellant's identity as a participant in the Dairy Mart robbery because they establish a modus operandi applicable to the Dairy Mart robbery. Indeed, the other robberies share common features with the Dairy Mart robbery: they involved a similar type of store (convenience store or gas station); the perpetrators always wore the same clothing; one of the perpetrators was always armed with a knife; and the perpetrators always stole money and cigarettes. Any differences between the other robberies and the Dairy Mart robbery do not require exclusion of the other robberies. As the Ohio Supreme Court stated, "[a]dmissibility is not adversely affected simply because the other robberies differed in some detail. * * * [D]ifferences do affect the relative probative value of these events but not their admissibility." State v. Jamison (1990),49 Ohio St.3d 182, 187. Det. Lacey's testimony regarding the other robberies therefore satisfies the second prong underLowe.
 {¶ 16} We therefore find that the trial court did not abuse its discretion when it admitted Det. Lacey's testimony under Evid.R. 404(B) for identity purposes. The prejudicial impact of the other robberies evidence was minimized because the trial court twice instructed the jury that it could consider Det. Lacey's testimony about the other robberies only on the disputed issue of appellant's identity as one of the Dairy Mart robbers. See State v. Bey, 85 Ohio St.3d 487, 1999-Ohio-283. Indeed, immediately following Det. Lacey's testimony regarding the other robberies, the trial court instructed the jury that the evidence was received only for the limited purpose of proving appellant's identity as one of the Dairy Mart robbers, and not as proof of appellant's character. The limiting instruction was again provided to the jury right before the deliberations. Absent evidence to the contrary, we must presume that the jury followed these instructions. See State v. Woodward (1993),68 Ohio St.3d 70, 73-74. Appellant's first assignment of error is overruled.
 {¶ 17} Assignment of Error No. 2:
 {¶ 18} "THERE WAS INSUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT AND THE DETERMINATION OF THE DEFENDANT'S GUILT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 19} Appellant first argues that there was insufficient evidence to support his convictions for aggravated robbery and theft when the only evidence of his alleged participation in the Dairy Mart robbery was Hughes' unsubstantiated and unsupported testimony. We disagree.
 {¶ 20} "[I]n reviewing a claim of insufficient evidence, `[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" State v. McKnight,107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quoting State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. In reviewing a sufficiency of the evidence claim, a reviewing court cannot substitute its evaluation of the credibility of the witnesses for that of the trier of fact. State v. Benge, 75 Ohio St.3d 136,143, 1996-Ohio-227.
 {¶ 21} In its case in chief, the state presented the testimony of Detectives Edward Holland and Jeffrey Lacey of the Goshen Police Department. The robbery of the Dairy Mart was initially investigated by Det. Holland before it was transferred to Det. Lacey. For purposes of this assignment of error, we will not consider the other robberies discussed in the first assignment of error.
 {¶ 22} Det. Holland testified that in addition to the Dairy Mart robbery, he also investigated the attempted robbery of a carwash located a block away from the Dairy Mart. The attempted robbery took place about a week before the Dairy Mart robbery. According to the detective, a videotape from a surveillance camera showed an individual with a ball cap walking to the rear of the carwash before walking away, and a few seconds later, another individual wearing a hoodie with a blue bandanna on his face walking to the back door and kicking it. The owner of a white car seen on the videotape was subsequently identified as Hughes. Likewise, the individual with the ball cap was eventually identified as Hughes.
 {¶ 23} Det. Holland questioned Hughes on April 10, 2004 regarding the carwash incident. In a written statement, Hughes implicated a Matt. Early in June, Det. Holland questioned Hughes and appellant regarding the Dairy Mart robbery. Both denied any involvement. On July 10, Det. Holland accompanied Milford police officers armed with a search warrant to Hughes' apartment. There, the detective observed a blue bandanna. Hughes was arrested that day. In a written statement, Hughes admitted that he and appellant robbed the Dairy Mart as well as a Speedway in Loveland, Ohio.
 {¶ 24} Det. Lacey testified that when he questioned appellant about the Dairy Mart robbery, appellant denied any involvement but stated he knew who did it: Hughes and Plant. Appellant never said that he wore a blue bandanna, wore a hoodie, brandished a knife, or had any stolen goods. Appellant did tell the detective that he smoked Marlboro Lights or Red. Det. Lacey testified that he too went to Hughes' apartment with the Milford police officers. There, he observed two or three bandannas. One was hidden under a chair cushion, another was in a box in a closet.
 {¶ 25} The state also presented the testimony of two persons who both knew appellant and Hughes. Jeffrey Lechner lived in the same apartment complex as Hughes' sister. At the time, Hughes' wife was babysitting Lechner's children. Lechner testified that around the time of the Dairy Mart robbery, between 1:30 a.m. and 2 a.m., loud noise from the hallway of the apartment complex woke his children up. The noise was caused by appellant and Hughes trying to get into Hughes' sister's apartment. Appellant and Hughes were both very excited. Hughes stated that "the cops had been harassing the two of them and following them * * * all night long." Lechner testified that Hughes was acting suspicious that night.
 {¶ 26} A few days later, Lechner went to Hughes' apartment. There, he observed several cartons of Marlboro cigarettes in Hughes' freezer. Lechner thought it was odd because they were not the brand of cigarettes Hughes smoked, and Hughes, then unemployed, had no money to buy cigarettes. Lechner asked Hughes if he had robbed a store. Hughes replied he had not but from the look on Hughes' face, Lechner knew he was lying. On April 15, 2004, Lechner went to the police. Although he told the police about seeing appellant and Hughes together around the time of the Dairy Mart robbery, this information was not in a written statement typed by a detective. Lechner could not explain why the information was not on the statement.
 {¶ 27} Jessica Elmore is an acquaintance of appellant and Hughes. She testified that on several occasions, appellant and Hughes openly discussed the robberies in her presence while at her house. She also testified seeing appellant (and Hughes) change into dark grey sweat pants and a dark grey hoodie before "going to work," an euphemism used by appellant and Hughes for committing a robbery. On the day of the Dairy Mart robbery, appellant and Hughes were both at Elmore's house but left, stating they were going to work. Before they left, Hughes stated they were going to Dairy Mart. Both were wearing dark grey hoodies.
 {¶ 28} In July 2004, Elmore turned over a dark grey hoodie, dark grey sweat pants, and a bandanna to Det. Lacey that had been kept at her house. Although she did not know whether they belonged to appellant or Hughes, she had seen appellant, Hughes, and King take dark grey sweat pants and hoodies in and out of a bedroom in her house. In fact, all three men had the "exact same [dark grey] hoodie outfits." She had, however, also seen a blue hoodie. Testimony at trial indicated that the outfit Elmore turned over could not be King's as he kept his outfit at his girlfriend's home and was significantly taller than Hughes and appellant.
 {¶ 29} Finally, the state presented the testimony of Hughes. Hughes testified that he had known appellant for six or seven years, and implicated him in the robbery of a Speedway in Loveland, Ohio on March 23, 2004 between midnight and 1 a.m. and as the individual in the hoodie who attempted to rob the carwash. Hughes further testified that (1) he and appellant robbed the Dairy Mart on April 6, 2004, stealing money and cigarettes, (2) appellant was the individual in the blue hoodie, (3) appellant was the one armed with the knife, (4) they subsequently changed their outfits before going to Hughes' sister's apartment, (5) they subsequently went back to their respective apartments which were in the same apartment complex, and (6) they used appellant's car for the robbery. Hughes also testified that they did not put the hoodies on until they were near the Dairy Mart, that it was appellant's idea to rob the store, and that following an argument between the two of them in the Dairy Mart parking lot, Hughes simply gave in. Hughes could not say whether the bandannas found at his apartment were the ones used in the Dairy Mart robbery or other robberies.
 {¶ 30} Construing this evidence in a light most favorable to the state, we find that a reasonable jury could have found sufficient circumstantial evidence to find beyond a reasonable doubt that appellant robbed the Dairy Mart on April 6, 2004, using a knife, and stole money and cigarettes. Circumstantial evidence and direct evidence have the same probative value.Jenks, 61 Ohio St.3d at 272. When the state relies upon circumstantial evidence to prove a charged offense, there is no requirement that the evidence be irreconcilable with any reasonable theory of innocence in order to support a conviction. Id. at 273. A conviction based on circumstantial evidence is no less sound than one based on direct evidence. State v. Mobus,
Butler App. No. CA2005-01-004, 2005-Ohio-6164, ¶ 51. We find there was sufficient evidence to support appellant's convictions for aggravated robbery and theft.
 {¶ 31} Appellant also argues that his convictions were against the manifest weight of the evidence. We disagree.
 {¶ 32} In considering a defendant's claim that his conviction was contrary to the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences that can be drawn from it, and considers the credibility of witnesses in order to determine whether in resolving conflicts in the evidence, the jury or trier of fact "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting State v. Martin
(1983), 20 Ohio App.3d 172, 175.
 {¶ 33} In making this analysis, the appellate court must be mindful that the trier of fact was in the best position to judge the credibility of the witnesses and the weight to be given the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus; State v. Nichols (1993),85 Ohio App.3d 65, 76.
 {¶ 34} In addition to the evidence recited above, the jury also heard testimony on appellant's behalf. First, appellant presented the testimony of his mother, Teresa Bromagen. Mrs. Bromagen's testimony was presented mostly to challenge Hughes' claim he had known appellant for six or seven years. Mrs. Bromagen also testified that on March 23, 2004, the day the Loveland Speedway was allegedly robbed by appellant and Hughes between midnight and 1 a.m., appellant went to the hospital at about 6:30 a.m. for the birth of his son.
 {¶ 35} Next, Christopher Durham testified on behalf of appellant. Durham testified that three to four months before the jury trial, when they were both in jail, Hughes told Durham that he was upset with appellant and that he was going to say that he and appellant robbed the Dairy Mart together when in fact appellant was not with him at all.
 {¶ 36} Finally, appellant presented the alibi testimony of two friends, Rebecca Herndon and her boyfriend Derrick Werling, who indicated that appellant spent the evening of April 5, 2004 with them in their apartment and that when they went to bed around 1 a.m. on April 6, appellant was still in their apartment. The robbery of the Dairy Mart occurred on April 6 at about 1:13 a.m. Both friends testified they remembered April 6 because Herndon's birthday was the very next day and Werling and appellant had repeatedly erred in whishing her a happy birthday too early.
 {¶ 37} Herndon also testified that a friend of hers, Tearsa, spent the evening with them and appellant. According to Herndon, after Herndon went to bed, appellant and Tearsa spent a few hours together in the living room catching up before Tearsa went home at 4 a.m. By contrast, Werling testified that Tearsa went home before 1 a.m. Appellant was asleep in the living room when Werling got up at 5 a.m. on April 6 but gone when Herndon got up at 9 a.m. Herndon also testified that if appellant had left shortly after she went to bed, she would have heard his loud car. Werling testified that the Dairy Mart was roughly 15 minutes away from their apartment. Werling also testified that he and Herndon talked about that evening together in appellant's attorney's office.
 {¶ 38} After a careful review of the record, we cannot conclude that the jury lost its way and committed a manifest miscarriage of justice in convicting appellant of aggravated robbery and theft. Although appellant presented the testimony of Durham and the alibi testimony of Herndon and Werling, we refuse to overturn the verdict because the jury did not believe the testimony presented on appellant's behalf. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony." State v. White, Butler App. No. CA2003-09-240, 2004-Ohio-3914, ¶ 28. Appellant's aggravated robbery and theft convictions are not against the manifest weight of the evidence. Appellant's second assignment of error is overruled.
 {¶ 39} Judgment affirmed.
Powell, P.J., and Bressler, J., concur.
[1] A review of Det. Lacey's testimony seems to indicate that appellant's car was used in three of the robberies: his car was borrowed for the Shell robbery in Miami Township and for one of the Super America robberies, and he personally drove Hughes, Plant, and King to the other Super America robbery. However, the respective briefs of appellant and the state only refer to two robberies.